IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| INTERNATIONAL CASINGS GROUP, INC., an Illinois corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 04-1081-CV-W-NKL |
| PREMIUM STANDARD FARMS, INC., a Delaware corporation, | ) ) ) ) | |
| Defendant. | ) | |

## VERIFIED COMPLAINT

Plaintiff International Casings Group, Inc. ("I.C.G."), for its Complaint against Defendant Premium Standard Farms, Inc. ("Premium"), alleges as follows:

## SUMMARY OF ACTION

1. I.C.G. sells casings for sausage products. For more than ten years, I.C.G. has purchased most of its hog casings from Premium. Although the parties reached final agreement on the terms of new long-term output contracts months ago (copies of the Agreements at issue are attached as Exhibits 1 and 2, respectively, and e-mails modifying the terms of the agreements are attached as Exhibit 3), Premium has now repudiated those agreements, and has advised I.C.G. it will stop selling its casings to I.C.G. by early January 2005. Premium's abrupt repudiation of these long-term commitments leaves I.C.G. without any source for this unique and specialized good to cover its supply and fill its orders with its customers, and severely cripples I.C.G.'s business. As a result, I.C.G. is left with no alternative but to bring this action for injunctive relief and for specific performance based on these contracts. Alternatively, I.C.G. asks that Premium be estopped to enjoin Premium from reneging on its promises to I.C.G., promises on which I.C.G. relied to its detriment. I.C.G seeks an Order from this Court enjoining

Premium from repudiating its agreements and requiring Premium to specifically perform its obligation to supply hog casings to I.C.G., or alternatively to do so until I.C.G. finds and contracts with a suitable alternative supplier, and for any damages resulting from Premium's conduct as alleged herein.

## PARTIES

2. Plaintiff I.C.G. is an Illinois corporation, with its headquarters and principal place of business in Chicago, Illinois. I.C.G. processes and sells natural casings for sausage products worldwide.

3. Defendant Premium is a Delaware corporation, with its principal place of business in Kansas City, Missouri. Premium is one of the largest pork producers in the country with production facilities in Missouri, North Carolina, and Texas.

## JURISDICTION AND VENUE

4. This action is between I.C.G., a citizen of Illinois, and Premium, a dual citizen of Delaware and Missouri. The amount in controversy is in excess of seventy-five thousand dollars, exclusive of interest and costs, as alleged below. This Court therefore has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a).

5. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(1) and 28 U.S.C. § 1391(a)(2), because the Defendant resides in this District and because a substantial part of the events giving rise to this action occurred within this District.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

6. As alleged more fully below, I.C.G. and Premium have had a long-standing business relationship by which I.C.G. purchased all of Premium's output of hog casings at its facilities in Milan, Missouri ("Milan facility") and Clinton, North Carolina ("Clinton facility").

7. The relationship began at least as far back as 1994 when I.C.G. and Premium entered into an agreement through which I.C.G. purchased all hog casings produced by Premium at its Milan facility. In August 1997, I.C.G. and Premium entered into a new output contract to supersede the 1994 agreement, by which I.C.G. purchased all hog casings produced by Premium at its Milan facility for a five-year term (hereinafter referred to as the "1997 Milan facility Agreement"). (A copy of the 1997 Milan facility Agreement is attached as Exhibit 4). The agreement automatically renewed for successive one-year terms, unless, at least 90 days before the end of the original term or any successive one-year term, either party elected to terminate the contract at the end of that term.

8. In August 1998, I.C.G. entered into an agreement with The Lundy Packing Company ("Lundy") by which I.C.G. purchased all hog casings produced by Lundy at its Clinton facility for a four-year term (hereinafter referred to as the "1998 Clinton facility Agreement"). (A copy of the 1998 Clinton facility Agreement is attached as Exhibit 5). The agreement automatically renewed for a two-year term, unless, at least 90 days before the end of the original term or the renewal term, either party elected to terminate the contract at the end of that term. In 2000, Premium purchased Lundy and continued performing under the 1998 Clinton facility Agreement.

9. On May 2, 2002, I.C.G. sent a letter electing not to renew the 1998 Clinton facility Agreement. (A copy of the May 2, 2002 I.C.G. letter is attached as Exhibit 6). In that letter, I.C.G. further stated that "[w]e sincerely hope that our current negotiation results in our continued partnership at your Clinton Plant."

10. Following I.C.G.'s election, Premium sent a letter electing not to renew the 1997 Milan facility Agreement when the then-current term concluded on August 18, 2002. (A copy of

the May 2, 2002 Premium letter is attached as Exhibit 7). In that same letter, Premium acknowledged receipt of I.C.G.'s election letter for the 1998 Clinton facility Agreement and further acknowledged that it had I.C.G.'s "current proposal for new contracts for both Milan and Clinton and are in the process of evaluating them."

11. At all times since May 2002, Premium continued to sell its hog casings produced at the Milan and Clinton facilities to I.C.G. (Copies of the spreadsheets reflecting purchases of hog casings for the Milan and Clinton facilities are attached as Exhibits 8 and 9, respectively).

12. By June 2002, I.C.G. forwarded draft agreements by which it proposed terms for new long-term output agreements with Premium for the purchase of its hog casings at the Milan and Clinton facilities. (A copy of a June 20, 2002 e-mail forwarding the output contracts is attached as Exhibit 10).

13. Between June 2002 and April 2004, the parties continued to do business when they negotiated the terms of new output contracts. As of August 1, 2002, the parties performed under a new pricing schedule with respect to the Clinton facility. As of February 14, 2003, the parties performed under a new pricing with respect to the Milan facility.

14. By late April 2004, the parties had resolved all outstanding issues, and, on or about April 27, 2004, I.C.G. sent to Premium written agreements signed by I.C.G. reflecting the agreements the parties had reached, by which I.C.G. offered to purchase Premium's hog casing output for the Milan and Clinton facilities. (A copy of an April 27, 2004 e-mail confirming that I.C.G. sent the signed agreements is attached as Exhibit 11). Because Premium has the original agreements signed by I.C.G., identical unsigned copies are attached as Exhibits 1 and 2. Premium acknowledged that it would sign and return executed copies of the agreements to I.C.G. (*See* Ex. 11).

15. The written offer reflected in the new output contracts (Exs. 1 and 2) provided that I.C.G. would supply all its hog casings produced at the Milan and Clinton facilities for a five-year term. The agreements automatically renewed for successive one-year terms, unless, at least 90 days before the end of the original term or any successive one-year term, either party elected to terminate the contract at the end of that term. (The agreements are hereinafter referred to as the "2004 Milan facility Agreement" and the "2004 Clinton facility Agreement"). The 2004 Milan facility Agreement superseded the 1997 Milan facility Agreement and commenced on February 15, 2003. The 2004 Clinton facility Agreement superseded the 1998 Clinton facility Agreement and commenced on April 27, 2004.

16. On June 7, 2004, Premium made a written counteroffer to I.C.G. in which it proposed two changes to the agreements, primarily reducing the term of each agreement from five years to three years. (A copy of Premium's June 7, 2004 e-mail is attached as Exhibit 12).

17. On June 21, 2004, I.C.G. accepted Premium's counteroffer. Premium agreed to modify the written agreements to reflect the two changes to the parties' contracts and send them to I.C.G. Because the parties had reached agreement, they agreed to begin using the new pricing effective June 28, 2004. (A copy of the June 21, 2004 e-mail is attached as Exhibit 3). The June 7, 2004 and June 21, 2004 e-mails shall collectively be referred to as the "June e-mails."

18. Following the parties' agreement to the final terms of their contracts, and Premium's acknowledgement that it would send the written agreements memorializing their contracts to I.C.G., Premium has continued to sell its production of hog casings at the Milan and Clinton facilities to I.C.G.

19. Instead of returning the written documents memorializing their contracts, and despite continued performance by both parties, on November 19, 2004, Premium notified I.C.G.

5

by telephone that it would not be returning the signed documents and repudiated the parties' contracts, advising I.C.G. it would cease selling hog casings to I.C.G. effective January 2005.

20. By November 22, 2004, I.C.G. received a letter from Premium dated November 17, 2004, terminating the business relationship between the parties. (A copy of the November 17, 2004 letter is a attached Exhibit 13). Premium requested that I.C.G. remove its casing equipment from the Milan and Clinton facilities by January 3 and January 10, 2005, respectively.

21. In the event Premium ceases supplying the hog casings, I.C.G. will lose 50% of its supply of hog casings. I.C.G. needs that supply of hog casings to complete its orders to customers and operate its business.

22. Based on the limited sources of supply of hog casings, and the prevalence of long-term output contracts regarding their sale to existing purchasers, I.C.G. cannot reasonably replace the hog casings if Premium's repudiation of its contracts with I.C.G. is allowed to stand.

23. If Premium ceases supplying the hog casings, I.C.G. will lose revenue at the rate of at least $5 million per year for the period it is without that supply.

## COUNTS

### COUNT I
(Preliminary and Permanent Injunction)

24. Plaintiff realleges and incorporates by reference as though fully stated herein paragraphs 1 through 23 of this Complaint as paragraph 24 of Count I.

25. Hog casings are goods within the meaning of Article 2 of the U.C.C., as adopted by Missouri and North Carolina.

26. I.C.G.'s June 21, 2004 written acceptance of Premium's June 7, 2004 written counteroffer regarding the output contracts created a valid and enforceable contract within the meaning of Article 2 of the U.C.C., as adopted by the State of Missouri for the 2004 Milan

facility Agreement and as adopted by the State of North Carolina for the 2004 Clinton facility Agreement, for Premium's output of hog casings subject to the terms set forth in the 2004 Milan and Clinton facility Agreements as modified by the June e-mails.

27. Premium is obligated to sell its output of casings from its Milan and Clinton facilities to I.C.G. on the terms set forth in the 2004 Milan and Clinton facility Agreements as modified by the June e-mails.

28. By notifying I.C.G. that it would cease selling its hog casings to I.C.G. by January 2005, Premium has repudiated and therefore breached the Agreements.

29. I.C.G. has a substantial and clear need for the Premium hog casings. I.C.G. cannot reasonably replace this volume of casings in six weeks, and will be unable to perform its agreements with its customers.

30. I.C.G. lacks an adequate remedy at law. I.C.G. cannot purchase cover goods on the market, will be unable to perform its contracts with its customers, and will suffer loss of revenue, market share, and permanent injury to its good will and reputation. I.C.G. cannot, therefore, be fully compensated by an award of monetary damages. For these same reasons, I.C.G. will be irreparably injured without injunctive relief.

31. Premium will suffer no injury if enjoined from repudiating their contracts. Premium has already been performing under the agreements, and I.C.G. will continue to pay Premium, as it has done to the present, for all the hog casings supplied.

32. Issuing an injunction promotes the public interest of protecting the enforcement of contracts entered into between parties.

## COUNT II
(Specific Performance based on Contract)

33. Plaintiff realleges and incorporates by reference as though fully stated herein paragraphs 1 through 32 of this Complaint as paragraph 33 of Count II.

34. Hog casings are goods within the meaning of Article 2 of the U.C.C., as adopted by Missouri and North Carolina, and the agreements at issue are valid agreements within the meaning of Article 2 of the U.C.C., as adopted by Missouri and North Carolina.

35. I.C.G. is irreparably harmed and lacks an adequate remedy at law, because I.C.G. cannot purchase cover goods on the market, will be unable to perform its contracts with its customers, and will suffer loss of revenue, market share, and permanent injury to its good will and reputation.

36. I.C.G. has performed to the present every obligation under the output contracts. I.C.G. has made every payment for all the hog casings purchased from Premium.

37. Accordingly, under U.C.C. § 2-716, as adopted by Missouri and North Carolina, I.C.G. is entitled to specific performance of the parties' output contracts for hog casings.

## **COUNT III**
(Specific Performance Based on Promissory Estoppel)

38. Plaintiff realleges and incorporates by reference as though fully stated herein paragraphs 1 through 23 of this Complaint as paragraph 48 of Count III.

39. The April 27, 2004 (Ex. 11) and June 21, 2004 (Exs. 3) e-mails sent by Premium constitute unqualified promises to enter into the 2004 Milan facility Agreement and 2004 Clinton facility Agreement.

40. I.C.G. relied to its detriment on Premium's promise to enter into the agreements and to continue to supply the hog casings as it has done for the past ten years. I.C.G. did not, therefore, seek alternative sources of supply, and relied on Premium's promise and its continued supply of hog casings after its promise to enter into the agreements.

41. I.C.G.'s reliance on the Defendants' unambiguous promises to enter into these agreements was expected and foreseeable based on the communications between the parties and the continued performance by both parties.

42. Fairness and equity require that Premium abide by its promise. I.C.G. is unable to purchase cover goods for 50% of its supply and I.C.G. will be unable to complete its orders with its customers. In addition, I.C.G. will be unable to negotiate the same type of contract to meet production needs for hog casings. Accordingly, there is no adequate remedy at law.

43. Accordingly, to the extent that this Court concludes these output contracts are not binding, Premium should be estopped from disavowing its unambiguous promise to enter into those agreements.

WHEREFORE, Plaintiff I.C.G. respectfully requests judgment against Defendant Premium:

a) Preliminarily and permanently enjoining Premium from terminating its output contracts with I.C.G.;

b) Ordering specific performance of Premium's obligation to continue operating under the output contracts with I.C.G., or in the alternative based on Premium's promise;

c) Alternatively, ordering that Premium must continue to perform under its output contracts with I.C.G. until I.C.G. can find an adequate alternate supplier, or in the alternative based on Premium's promise;

(d) Awarding costs and disbursements of this suit; and

(e) Awarding such other and further relief as the Court may deem just and proper.

Dated: November 30, 2004	Respectfully submitted,

**INTERNATIONAL CASINGS GROUP, INC.**

By: /s/ Michael P. Joyce
One of Its Attorneys

Michael P. Joyce
Van Osdol, Magruder, Erickson & Redmond, P.C.
2400 Commerce Tower
911 Main Street
Kansas City, MO 64105
Tel: (816) 421-0644
Fax: (816) 421-0758

Paul T. Fox (*pro hac vice pending*)
Andrew J. Enschedé (*pro hac vice pending*)
Howard K. Jeruchimowitz (*pro hac vice pending*)
Paul Del Aguila *(Admitted in the Western District)*
Greenberg Traurig, LLP
77 W. Wacker Drive
Suite 2500
Chicago, IL 60601
Tel: (312) 456-8400
Fax: (312) 456-8435
*Attorneys for Plaintiff*

# VERIFICATION

I, Tom Sanecki, President of International Casings, Inc., being duly sworn, certify that I have read the foregoing Verified Complaint, that I have personal knowledge of the matters complained therein, and the facts set forth in the Verified Complaint are true and correct to the best of my knowledge, information and belief.

                                                TOM SANECKI

                                            /s/ Tom Sanecki

SUBSCRIBED and SWORN to before me
this  30th day of November, 2004.

 /s/ Deana G. Gardner
NOTARY PUBLIC